# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MARLA S. ROSEN,     :
  PLAINTIFF,     :
          :   CIVIL ACTION NO.
    v.      :   3:10-CV-01911 (VLB)
          :
MICHAEL ALQUIST,    :
  DEFENDANT.    :   DECEMBER 7, 2012

## MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. #24]

### I.  Introduction

The Plaintiff, Marla S. Rosen ("Rosen"), brings this action for monetary relief against Defendant Police Officer Michael Alquist ("Alquist" or "Sergeant Alquist") pursuant to 42 U.S.C. § 1983 for malicious prosecution and false arrest in violation of the Fourth Amendment stemming from Rosen's arrest pursuant to a warrant.  Plaintiff also alleges intentional and negligent infliction of emotional distress under Connecticut law.  Pending before the Court is Defendant's Motion for Summary Judgment in which Defendant contends that the warrant and Rosen's subsequent arrest were supported by probable cause.  For the reasons stated hereafter, the Defendant's Motion for Summary Judgment on Plaintiff's federal law claims is GRANTED.  The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

### II.  Factual Background

As an initial matter, the Court notes that Fed. R. Civ. P. 56(c)(1) requires that

> [a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact.

Rules 56(c)(2) and (c)(3) declare that a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence" and that "[t]he court need consider only the cited materials, but it may consider other materials in the record."  Additionally, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . [or] grant summary judgment if the motion and supporting materials – including the facts considered disputed – show that the movant is entitled to it . . ."  Fed. R. Civ. P. 56(e)(2), (e)(3).

Further, Local Rules of this district impose several specific requirements on the parties when arguing a summary judgment motion.  Local Rule 56 requires that a party filing a summary judgment motion annex a "concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)(1).  "All material facts set forth in said statement and supported by the evidence will be deemed admitted unless

controverted by the statement required to be filed and served by the opposing party. . ." *Id.* Local Rule 56(a)(2) requires that the papers opposing a motion for summary judgment shall include a document which states "whether each of the facts asserted by the moving party is admitted or denied" and must also include a "list of each issue of material fact as to which it is contended there is a genuine issue to be tried." Each statement of material fact in a Local Rule 56(a)(1) or Local Rule 56(a)(2) statement, as well as each denial in a summary judgment opponent's Local Rule 56(a)(2) statement, "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." D. Conn. L. Civ. R. 56(a)(3).

Here, Defendant Alquist has submitted a Local Rule 56(a)(1) statement in support of his Motion for Summary Judgment. Plaintiff, however, has failed to include a proper 56(a)(2) statement  with her Objection to Defendant's Motion for Summary Judgment. Instead, Plaintiff declares that she "adopts the factual background as set forth in the Defendant's Memorandum of Law in Support" with the exception of certain enumerated "comments or disputes," in explanation of which Plaintiff only partially references portions of Defendant's 56(a)(1) statement with which she takes issue. [Dkt. 25-1, P's Objection to MSJ at p. 3]. Plaintiff has also submitted portions of Alquist's and her own deposition testimony in support of her Objection. Thus, the Court will consider the facts presented in Defendant's 56(a)(1) statement and the admissible evidence to which it cites to be controlling where adopted by Rosen, or where Rosen has objected to such facts but has failed to support her objection with admissible evidence in the record. *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (holding that Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"). Where a fact has been adequately disputed, the Court notes such.

On January 16, 2008, Sergeant Alquist, a member of the West Hartford Police Department ("WHPD"), was dispatched to King Philip Middle School in West Hartford to investigate a report of possible sexual abuse of a seventh grade, twelve year old female student (the "alleged victim" or the "girl") by her step-father. [Dkt. 24-2, D's 56 Stmnt. at ¶¶ 1, 3; Dkt. 24-8, Arrest Warrant Affidavit ("AWA") at ¶ 2]. Upon his arrival a guidance counselor, Megan Johnson, informed Sergeant Alquist that she had received a call from a parent, Lleidy Deleon (also known as Lleidy Gonzalez), who informed Ms. Johnson that the alleged victim had told her that her step-father, Marvin Brown, had touched her on her "privates" really hard. [Dkt. 24-2, D's 56 Stmnt. at ¶ 4]. Ms. Deleon also recounted to Ms. Johnson that the alleged victim told her she had reported the incident to her mother – Plaintiff Marla Rosen – who made Mr. Brown leave the home the next day. [*Id.* at ¶ 5]. Ms. Deleon reported that the alleged victim had told her earlier that day that she did not want to go to her home after school because her stepfather was there babysitting her younger siblings; thus, Ms. Deleon had gathered the alleged victim from school and brought her to her own home. [*Id.* at ¶ 6; Dkt. 24-7, WHPD Incident Report at p. 2]. Ms. Johnson informed

4

Sergeant Alquist that she would report this incident to the Connecticut Department of Children and Families.  [Dkt. 24-2, D's 56 Stmnt. at ¶ 7].

After speaking with Ms. Johnson, Sergeant Alquist proceeded that same day to speak with Ms. Deleon at her home.  [Dkt. 24-2, D's 56 Stmnt. at ¶ 8].  Ms. Deleon reported that the alleged victim had disclosed to her that Mr. Brown had molested her on New Year's Eve and, when Ms. Deleon asked the alleged victim what Mr. Brown had done, the girl responded that "he was touching my private on New Year's Eve."  [*Id.* at ¶¶ 9, 10].  According to Ms. Deleon, the alleged victim disclosed that she had told her mother, Marla Rosen, about the incident, and that Rosen had responded that Mr. Brown was probably drunk and the alleged victim should not tell anyone about the incident because then the police would be involved.  [*Id.* at ¶¶ 11, 12].

Sergeant Alquist then interviewed the alleged victim, who recounted that Marvin Brown had come into her bed on New Year's Eve and "touched [her] on [her] down part."  [Dkt. 24-2, D's 56 Stmnt. at ¶ 13].  When asked whether Brown had touched her over or under her clothes, the alleged victim responded "under." [*Id.*].  The girl recounted that she had told her mother, the Plaintiff, about the incident and the Plaintiff had made Mr. Brown leave the next day, and also that Mr. Brown had been back to visit her younger siblings a few times but always when her mother was there.  [*Id.* at ¶¶ 14, 15].  She disclosed that she had called her mother at work earlier in the day on January 16, 2008 and learned that Mr. Brown was at her home babysitting her younger siblings.  The alleged victim told her mother that she was uncomfortable being in the house with Mr. Brown and

5

asked if she could go to the library instead of returning home after school.  [*Id.* at ¶ 15].  The Plaintiff assented, as long as her daughter could find someone to walk with her to the library.  When the alleged victim could not find anyone to accompany her, she called Ms. Deleon to request that she be allowed to go to her house instead.  [*Id.*].  During her interview with Alquist, the alleged victim contradicted Ms. Deleon's report and asserted that her mother, the Plaintiff, had *not* instructed her to tell no one about the incident.  [*Id.*; Dkt. 24-8, AWA at ¶ 4].

After speaking with the alleged victim, Sergeant Alquist proceeded to Rosen's home to interview her.  [Dkt. 24-2, D's 56 Stmnt. at ¶ 16].  Rosen explained to Alquist that her daughter had come into her bedroom during the night in question and had told her that Mr. Brown had come into her bed and put his arm around her.  [*Id.* at ¶ 17].  Rosen asserted that she questioned Mr. Brown about what had happened and he answered that he did not remember.  [*Id.*].  Rosen recounted that Mr. Brown had consumed a "couple of beers" that night and could have made a mistake, "thinking that he was climbing into bed with" Rosen and not with her daughter.  [*Id.*].  Rosen further stated that she and the other children slept in her bed with the door locked for the rest of the night "just to be safe."  [*Id.* at ¶ 18].  The next day, Rosen told Mr. Brown that he had to leave, and he did.  [*Id.*].  Rosen admitted to Alquist, though, that Mr. Brown had visited the house a few times since New Year's Eve to see his two children (the younger siblings of the alleged victim), but he never stayed overnight.  [*Id.*].  At the conclusion of the interview, Rosen also admitted that she told the alleged victim

6

not to tell her birth father (who is not Mr. Brown) about the incident because it would make him upset.  [*Id.*; Dkt. 24-8, AWA at ¶ 5].

Sergeant Alquist continued to investigate by interviewing the alleged victim's fourteen-year-old brother, who stated that he awoke around midnight on New Year's Eve because he heard the alleged victim crying.  [Dkt. 24-2, D's 56 Stmnt. at ¶ 19].  The parties dispute what Rosen said to the alleged victim's brother that night.  The boy informed Alquist that Rosen said "Marvin was in the bed doing inappropriate things with the victim."  [*Id.*].  Rosen testified at her deposition that she might have said "he did something inappropriate," rather than that Mr. Brown did "inappropriate things."  [Dkt. 25-1, P's Obj. to MSJ at p. 5; Dkt. 25-8, Exh. P-5, Rosen Depo. at 79].  The alleged victim's brother also confirmed that Mr. Brown had left the home the day after the incident but had visited his stepbrother and stepsister on a few occasions.  [Dkt. 24-2, D's 56 Stmnt. at ¶ 19].

On January 17, 2008, Sergeant Alquist and another West Hartford Police detective interviewed Mr. Brown, who stated that on New Year's Eve he had decided to lie down on the alleged victim's bed because his back was sore from sleeping on the couch.  [Dkt. 24-2, D's 56 Stmnt. at ¶ 20].  He alleged that Rosen had awoken him later that night and had told him that he had touched her daughter.  [*Id.*].  Brown told Alquist, however, that he did not recall if he had touched the alleged victim.  [*Id.*].  He admitted that Rosen had asked him to leave the following day and he had complied.  [*Id.*].  Sergeant Alquist obtained a sworn statement from Mr. Brown on January 17, 2008 containing the foregoing

information.  [Dkt. 24-2, D's 56 Stmnt. at ¶ 21; Dkt. 24-12, Exh. E, Brown Statement].

The alleged victim participated in a forensic interview at the Children's Advocacy Center at St. Francis Hospital on January 23, 2008, observed by Sergeant Alquist and a representative from the Connecticut Department of Children and Families ("DCF").  [Dkt. 24-2, D's 56 Stmnt. at ¶¶ 23, 24].  The interviewer asked the alleged victim if she knew what the purpose of the interview was, to which the alleged victim replied, "because my step-father molested me." [Dkt. 24-2, D's 56 Stmnt. at ¶ 25].  The girl reiterated that Mr. Brown came into her bed and that he "touched me on my down part."  [*Id.* at ¶ 26].  When asked to clarify what "down part" meant, the alleged victim was embarrassed and wrote "vigina" on a piece of paper, which she confirmed with the interviewer meant vagina.  [*Id.*].  This slip of paper was later logged by Alquist as evidence.  [*Id.* at ¶ 28].  The girl further clarified that the touching was under her clothing, both on the outside and inside of her vagina.  [*Id.* at ¶ 26].  At the conclusion of the interview, Sergeant Alquist, the DCF representative, and the interviewer spoke with Rosen and informed her of what her daughter had disclosed.  [*Id.* at ¶ 27].  At no point did either the forensic interviewer or the DCF representative indicate to Alquist that they believed the alleged victim to be lying about her allegation.  [*Id.* at ¶¶ 29, 30].

On January 24, 2008, Rosen called Sergeant Alquist and told him that she had had a lengthy and explicit talk with her daughter about what her daughter had disclosed in the forensic interview.  [Dkt. 24-2, D's 56 Stmnt. at ¶ 35].  Rosen

divulged that she felt there was something wrong with the alleged victim's disclosure of being penetrated by Mr. Brown because the girl had told her that Mr. Brown did not touch the inside of her vagina.  [*Id.*].  At the time of the phone call, Sergeant Alquist was aware that, as part of the forensic interview process, the Children's Advocacy Center strongly urges parents or guardians of victims not to attempt to re-interview a victim or ask a victim about specific details of the incident after the interview has concluded.  [*Id.* at ¶ 34].  The parties dispute who initiated the conversation between Rosen and her daughter, but Rosen admitted that, during the phone call to Sergeant Alquist, she had told Alquist that she did not know who had initiated the conversation.  [*Id.* at ¶57].  Sergeant Alquist has testified that he did not know that the alleged victim had supposedly initiated the conversation with her mother until the day before his deposition on April 6, 2012, more than four years after Alquist had submitted the AWA and the warrant for Rosen's arrest had been granted.  [Dkts. 24-5 – 24-6, Alquist Depo. at pp. 72-73]. Following Rosen's phone call, Sergeant Alquist watched the DVD recording of the forensic interview, which confirmed that the alleged victim had stated that Mr. Brown touched her on both the outside and inside of her vagina.  [*Id.* at ¶ 36]. Rosen did not observe the forensic interview, never watched the DVD of the interview, and did not listen to the audio recording of the interview.  [*Id.* at ¶ 37]. Rosen did admit during deposition, though, that although she did not specifically remember doing so, she believed she had consented to the Center interviewing her daughter.  [Dkt. 24-9, Rosen Depo. at p. 65].

Based on his investigation, Sergeant Alquist prepared an Arrest Warrant Affidavit ("AWA") for the arrest of Marvin Brown on the charges of Sexual Assault in the First Degree and Impairing the Morals of a Minor.  [Dkt. 24-2, D's 56 Stmnt. at ¶ 32].  Mr. Brown turned himself in and was arrested on April 22, 2008.

Based on the information known to him at the time, Sergeant Alquist also prepared an Arrest Warrant Affidavit for the arrest of Marla Rosen on the charge of Risk of Injury to a Minor in violation of Connecticut General Statutes § 53-21.  [Dkt. 24-2, D's 56 Stmnt. at ¶¶ 46, 47].  Sergeant Alquist's supervisor, Lieutenant Don Melanson, reviewed the AWA for Rosen's arrest and signed it on March 24, 2008.  [*Id.* at ¶ 49].  Prosecutor John O'Reilly signed the AWA on March 25, 2008, and Connecticut Superior Court Judge Bright signed it on March 26, 2008.  [*Id.* at ¶ 50].

The eleven paragraph AWA includes a description of Sergeant Alquist's interviews with the alleged victim (in which she made her accusations of sexual assault against Marvin Brown), Lleidy Deleon, Marla Rosen, the alleged victim's fourteen year-old brother, and Marvin Brown, as recounted above, as well as a description of the forensic interview with the alleged victim and Rosen's subsequent phone call to Alquist.  [Dkt. 24-8, Ex. C, AWA].  Sergeant Alquist summarized his basis for probable cause to arrest the Plaintiff as follows:

> That Marla Rosen's response to this incident demonstrates that she willfully permitted her children to be placed at risk by the following circumstances: never reporting her daughter's disclosure of being sexually abused to the police, her minimizing of the abuse by describing it as Marvin putting his arm around the victim when question by the police, her allowing Marvin repeated access to the victim and her other children

> after the disclosure and her attempt to alter her
> daughter's disclosure by reviewing details of the
> forensic interview with her.

[*Id.* at ¶ 10].

Rosen was arrested on May 2, 2008 and the criminal charge against her was subsequently nolled by the prosecutor and dismissed thirteen months later. [Dkt. 24-2, D's 56 Stmnt. at ¶¶ 52, 53].

Rosen alleges that Sergeant Alquist did not have the requisite probable cause to obtain a warrant for her arrest. Alquist contends that probable cause for the arrest warrant existed and that Rosen's allegations must therefore fail.

### III.   Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd*

*Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

## IV.    Discussion

Defendant Alquist moves for summary judgment as to the Plaintiff's false arrest and malicious prosecution claims, arguing that these claims are barred because Alquist had probable cause to arrest Rosen.  Plaintiff argues that no probable cause existed for her arrest.

In analyzing a Section 1983 claim of false arrest or imprisonment, federal courts generally look to the law of the state where the arrest occurred.  *Davis v.*

*Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004).  Under Connecticut law, "[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another."  *Russo v. City of Bridgeport*, 479 F.3d 196, 204 (2d Cir. 2007) (quoting *Outlaw v. City of Meriden*, 43 Conn. App. 387, 392 (1996)). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983."  *Walczyk v. Rio*, 496 F.3d 139, 152 n.14 (2d Cir. 2007) (internal quotation marks and citation omitted).  Connecticut law places the burden on the false arrest plaintiff to prove the absence of probable cause.  *See Davis*, 364 F.3d at 433 (citing *Beinhorn v. Saraceno*, 23 Conn. App. 487, 491, 582 A.2d 208 (1990)); *Vangemert v. Strunjo*, No. 3:08CV00700 (AWT), 2010 WL 1286850, at *4 (D. Conn. Mar. 29, 2010).

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law."  *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) (citations omitted).  "To prevail on a malicious prosecution claim under Connecticut law, a plaintiff must prove the following elements: (1) the defendant initiated or continued criminal proceedings against the plaintiff; (2) the criminal proceeding terminated in favor of the plaintiff; (3) 'the defendant acted without probable cause;' and (4) 'the defendant acted with malice.'"  *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (*quoting McHale v. W.B.S. Corp.*, 187 Conn. 444, 446

(1982)).  Therefore, the existence of probable cause constitutes an affirmative defense against a malicious prosecution claim.

Probable cause to arrest exists where an officer has "knowledge or reasonable trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citations omitted).  *See also Walczyk*, 496 F.3d at 156 ("[F]ederal and Connecticut law are identical in holding that probable cause to arrest exists when police officers have 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.") (quoting *Weyant v. Okst*, 101 F. 3d 845, 852 (2d Cir. 1996)).  "Whether probable cause existed is a question that may be resolved as a matter of law on a motion for summary judgment if there is no dispute with regard to the pertinent events and knowledge of the officer."  *Weinstock v. Wilk*, 296 F. Supp. 2d 241, 256 (D. Conn. 2003) (citing *Weyant*, 101 F.3d at 852).  Moreover, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest."  *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).  *See also Johnson v. Ford*, 496 F. Supp. 2d 209, 213 (D. Conn. 2007) (AWT) ("Because the existence of probable cause depends on the probability, rather than the certainty, that criminal

14

activity has occurred, the validity of an arrest does not require an ultimate finding of guilt.").

Probable cause is to be assessed on an objective basis."  *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007).  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citation omitted).  "Other than the facts known to the arresting officer at the time of arrest, an officer's state of mind is irrelevant."  *Id.* at 153.  Thus, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."  *Id.* (internal quotation marks omitted).  The Second Circuit has explained that "probable cause is a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules . . . While probable cause requires more than a mere suspicion of wrongdoing, its focus is on probabilities, not hard certainties."  *Walczyk*, 496 F.3d at 156 (internal quotation marks and citation omitted).  "In assessing probabilities, a judicial officer must look to the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  *Id.*  In sum, probable cause "requires only such facts as make wrongdoing or the discovery of evidence thereof probable."  *Id.* at 157.

An arrest pursuant to a warrant issued by a neutral magistrate "is presumed reasonable because such warrants may issue only upon a showing of

probable cause." *Walczyk*, 496 F.3d at 155-56.  "[A] plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (internal citations omitted). "To rebut this presumption, the plaintiff must show that 'the officer submitting the probable cause affidavit knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit or omitted material information, and that such false or omitted information was necessary to the finding of probable cause.'" *Gleis v. Buehler*, 374 Fed. Appx. 218, 220 (2d Cir. Apr. 26, 2010) (*quoting Soares v. State of Conn.*, 8 F. 3d 917, 920 (2d Cir. 1993)). Even where a plaintiff does make a showing that there were material omissions or false statements, "a court may grant summary judgment based on qualified immunity where the evidence, viewed in the light most favorable to the plaintiffs, discloses no genuine dispute that a magistrate would have issued the warrant on the basis of the 'corrected affidavits.'" *Walczyk*, 496 F.3d at 158 (emphasis in the original).   Under the corrected-affidavit doctrine, courts look to the "hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on existing facts known to the applicant," would still have been sufficient to find probable cause to arrest. *Escalera v. Lunn*, 361 F.3d 737, 743-44 (2d Cir. 2004); *Deloatch v. Kelsey*, 3:08CV1871(MRK), 2010 WL 1981564, at *4 (D. Conn. May 18, 2010) ("the Court must construct what a hypothetical, 'corrected' warrant application would contain, based on the facts as they were known to the applicant, and must decide whether this corrected affidavit would support probable cause to arrest.").  "If, after restoring the omitted information,

probable cause remains, no constitutional violation of the plaintiff's Fourth Amendment rights has occurred.  Summary judgment on this element is appropriate where the evidence, viewed in the light most favorable to the plaintiffs, discloses *no genuine dispute* that a magistrate would have issued the warrant on the basis of the corrected affidavits.  [T]here can be no such dispute where a court is able to determine, as a matter of law, that the corrected affidavit would have been sufficient to support a finding of probable cause."  *Smolicz v. Borough/Town of Naugatuck*, 281 Fed. Appx. 32, 33 (2d Cir. 2008) (internal quotation marks and citation omitted).

Defendant Alquist argues that the undisputed facts demonstrate that there was probable cause to arrest Rosen, predicated on (1) Rosen's failure to disclose her daughter's alleged sexual abuse to the police and/or to DCF; (2) Rosen's minimization of her daughter's allegations of abuse by describing Marvin Brown's contact with her daughter as putting his arm around the alleged victim; (3) Rosen's allowance of repeated access to the alleged victim and to her other children after her daughter disclosed the alleged sexual abuse to her; and (4) Rosen's attempt after her daughter's forensic interview with the Children's Advocacy Center to alter her daughter's disclosure.

Rosen, on the other hand, contends that no probable cause existed to arrest her.  First, Rosen contends that she is not a mandated reporter, and thus did not break any law by failing to disclose the allegations of the alleged victim. Rosen asserts that she had no reason to believe Mr. Brown had ever committed sexual abuse with a minor because he had no history or record of sexual assault

17

or risk of injury to a minor.  Second, Rosen contends that she did not violate any law by minimizing the abuse, and that the use of the term "minimizing" by Sergeant Alquist was a subjective judgment that could not form the basis for probable cause.  Third, Rosen argues that Mr. Brown was legally permitted to see his own two biological children, he had left the house after Rosen demanded that he do so on January 1, 2008, and he had only been back to the home to babysit his biological children on two occasions when Rosen was not present.  In addition, Rosen argues there is no evidence that the alleged victim and Mr. Brown were in the home at the same time after the date of the alleged sexual contact. Fourth, Rosen asserts that there is no evidence that she was aware of the Children's Advocacy Center's policy of not discussing forensic interviews with victims; thus her discussion with her daughter about the interview may not form the basis for probable cause.

Moreover, Rosen contends that Sergeant Alquist intentionally and with malice and deliberation omitted information and included misleading language in the Arrest Warrant Affidavit.  Rosen argues that the AWA should have detailed the following information: (1) that Sergeant Alquist was told by Rosen that the alleged victim initiated discussion of the forensic interview; (2) that Brown's "repeated access" to the alleged victim constituted only two occasions on which Mr. Brown babysat his biological children without Rosen or the alleged victim present, rather than multiple occasions as the AWA implies; and (3) that Mr. Brown never had access to the alleged victim after the incident.

Under Connecticut law, a person is guilty of risk of injury to, or impairing the morals of, a child if he or she:

> Willfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child.

Conn. Gen. Stat. §53-21(1).  A person of reasonable caution would conclude based on information known to Alquist at the time that Rosen's alleged conduct of failing to report her daughter's disclosure to the police or to the Department of Children and Families, her minimization of the alleged abuse, Mr. Brown's continued access to the alleged victim *or* Rosen's other children, and Rosen's attempt to alter or to minimize her daughter's disclosure qualified as risking injury to or impairing the morals of her daughter and/or her other children under Conn. Gen. Stat. §53-21(1).  Consequently, Sergeant Alquist's knowledge was sufficient to warrant a person of reasonable caution in believing that Rosen had put her children at risk of injury and/or risk of moral impairment under Conn. Gen. Stat. §53-21(1).

     a. <u>Probable Cause For Plaintiff's Arrest</u>

Whether the arrest warrant affidavit demonstrates probable cause is a question of law.  *Walczyk*, 496 F.3d at 157.  In answering such a question, however, "a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate."  *Id.* (*citing Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (holding that the duty of the reviewing court is "simply to ensure that the magistrate had a substantial basis" for a probable cause

19

determination) (internal quotation marks omitted)).  When reviewing the facts in the light most favorable to the Plaintiff and taking into account the facts known to Sergeant Alquist at the time of the arrest, the Court finds that a person of reasonable caution would believe that Rosen had placed the alleged victim or her other minor children in a situation where the health of such children was likely to be injured or their morals to be impaired.

At the time Alquist applied for the arrest warrant, Alquist possessed knowledge of and included in the AWA the following undisputed information: the twelve-year-old alleged victim had reported that Mr. Brown had sexually assaulted her under her clothing, both on the inside and outside of her vagina; the alleged victim's fourteen-year-old brother had reported that he heard his sister crying on the night in question and the Plaintiff told him that Mr. Brown had been involved in something "inappropriate" with the alleged victim; during the night in question, after the alleged victim's allegations of abuse, Rosen slept with her children in her bedroom with the door locked "just to be safe"; Rosen told her daughter not to tell her birth father about the incident; the day after the incident, Rosen told Brown to leave the home and he complied; Marvin Brown could not recall if he had touched the alleged victim sexually but admitted that he had climbed into her bed on the night of the incident; the alleged victim had reported the incident to both her mother and to Lleidy Deleon, the mother of a friend, and had expounded on her allegations during a forensic interview observed by Alquist and a DCF representative; when interviewed, Rosen stated that Brown had consumed a couple of beers and "could have made a mistake, thinking he

was climbing into bed with her" instead of with her daughter; Rosen had recounted that her daughter had come into her room during the night in question and told her that Brown "had come into bed with her and put his arm around her"; after the forensic interview of the alleged victim, Rosen engaged in a lengthy conversation with her daughter about the interview and subsequently called Alquist to tell him that she felt there was something wrong with the girl's disclosure of being penetrated by Brown, as her daughter had told her that Brown did not touch the inside of her vagina; the Children's Advocacy Center had a policy of informing parents and guardians not to attempt to re-interview children participating in forensic interviews; Marla Rosen was present at the Children's Advocacy Center for her daughter's interview although she had not watched it, and had subsequently been informed of what her daughter had disclosed; and Brown had been back to the Rosen home a few times since the incident and allegations (with Rosen's permission) to visit and/or babysit his biological children when the alleged victim and/or other children were home.  Moreover, Alquist knew and Rosen does not dispute that from the night in question to January 16, 2008, the date on which guidance counselor Megan Johnson contacted the West Hartford Police Department about this incident, Rosen did not notify either the WHPD or DCF of her daughter's sexual abuse allegations. Significantly, Rosen has agreed to the accuracy of the information in the AWA of which she has personal knowledge, aside from the minor deviances addressed in her Objection to Defendant's motion for summary judgment and detailed in this Memorandum of Law.  [Dkt. 24-2, D's 56 Stmnt. at ¶ 56].

This information, known to Alquist at the time, provided ample support for Alquist's determination that probable cause existed for Rosen's arrest.  First, Alquist relied on and supplied in the AWA the alleged victim's statements regarding the alleged sexual contact, later reiterated by the alleged victim during the forensic exam, which was witnessed by Alquist, a DCF representative, and the interviewer and preserved on DVD.  Alquist also included communications made to him during his interviews with Marvin Brown, Rosen, Lleidy Deleon, and the alleged victim's fourteen-year-old brother.  A "police officer may rely upon the statements of victims or witnesses to determine the existence of probable cause for the arrest, . . . , regardless of the ultimate accurateness or truthfulness of the statements."  *Bourguignon v. Guinta*, 247 F. Supp. 2d 189, 193 (D. Conn. 2003) (internal quotation marks and citation omitted).  *See also Curley v. Vill. of Suffern*, 268 F. 3d 65, 70 (2d Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity"); *Martel v. Town of South Windsor*, 345 Fed. Appx. 663, 664 (2d Cir. Sept. 14, 2009) (quoting same); *Martinez v. Simonetti*, 202 F. 3d 625, 634 (2d Cir. 2000) ("police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed"); *Stone v. Town of Westport*, 411 F. Supp. 2d 77, 87 (D. Conn. 2006) (JBA) ("it is well established that a law enforcement officer has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth") (internal citation omitted).

Here, Sergeant Alquist was entitled in his probable cause analysis to rely on the consistent statements made by the alleged victim that Mr. Brown had sexually assaulted her, and on Alquist's interviews with Lleidy Deleon and the alleged victim's brother, which corroborated or supplemented the girl's allegations.  The record does not indicate that Sergeant Alquist had cause to believe that the alleged victim was not telling the truth, nor does the record indicate that Lleidy Deleon or the alleged victim's brother were untruthful. Moreover, neither the DCF representative who witnessed the forensic interview of the alleged victim at Saint Francis nor the forensic interviewer ever indicated to Sergeant Alquist that they believed the girl to be lying about her allegations. Notably, the Plaintiff admitted during her sworn deposition both that she was concerned about the potential physical contact between her daughter and Marvin Brown and that she did not understand what had happened between them.  [Dkt. 25-16, Rosen Depo. at pp. 32, 34, 46, 53, 56].  On the night in question, Rosen felt strongly enough about her daughter's accusation that she gathered her four children in her bedroom and slept with the door locked for the rest of the night, "just to be safe."  Thus, in crediting the testimony of the alleged victim and the other witnesses, and in giving weight to the Plaintiff's own beliefs and actions, which were known to Sergeant Alquist at the time he prepared the AWA, a reasonable person would conclude that Marvin Brown had potentially placed the alleged victim in both physical and moral danger.  This conclusion would necessarily lead a reasonable person to further conclude that ongoing contact between Marvin Brown – against whom allegations of sexual assault had been

levied – and the alleged victim or other children would pose a continued risk of danger to those children.

In light of Alquist's reasonable conclusion that Mr. Brown could pose a danger to the alleged victim and Rosen's other children, the Court finds that Sergeant Alquist possessed ample evidence to conclude that Marla Rosen had committed or was committing risk of injury to a minor based on the totality of her responses to her daughter's allegations.  First, Sergeant Alquist was aware at the time he applied for Rosen's arrest warrant that Rosen had not reported her daughter's accusations to either DCF or to the police.  Despite the incident having occurred around December 31, 2007, the West Hartford Police Department did not become aware of the alleged victim's accusations until January 16, 2008, a full two weeks later, when the alleged victim's school guidance counselor reported the incident to the police after having received a call from a concerned parent, Lleidy Deleon.  Rosen does not dispute that she did not contact authorities, but rather argues only that she did not break any laws by remaining silent because she is not a mandated reporter, because Mr. Brown had no history of sexually abusing minors, and because Rosen did not know what, if anything, had transpired between her daughter and Mr. Brown.  [Dkt. 25-16, Rosen Depo. at pp. 34-35]

When interviewed, Rosen made statements that led Alquist to reasonably determine that Rosen, who had not reported her twelve-year-old daughter's alleged sexual abuse, was also attempting to minimize it.  Rosen described the alleged sexual contact to Alquist as "Marvin putting his arm around the victim"

and reported that Mr. Brown had consumed "a couple of beers" on the night in question.  She offered her belief that Brown could have mistakenly thought he was getting into bed with Rosen and not with the alleged victim.  Furthermore, Rosen admitted to Alquist that she had told her daughter not to tell her birth father about the incident because she feared it would make him upset. Significantly, Rosen admitted to Alquist that Mr. Brown had returned to the home a few times since the incident to visit his biological children (ages four and five). Both the alleged victim and her elder brother corroborated that, in the two weeks between the incident and Alquist's interviews with Rosen, the alleged victim, and the alleged victim's brother, Mr. Brown had returned to the home to either visit or babysit his children.  Based on this information alone, it is objectively reasonable that Sergeant Alquist believed Rosen had not taken and was not taking proper steps to assure her daughter's safety, or the safety of the other children in her home.

Moreover, Sergeant Alquist reasonably attributed significance to Rosen's reactions to her daughter's forensic interview at the Children's Advocacy Center at St. Francis Hospital.  Although Rosen did not watch the interview in which her daughter stated that Marvin Brown had touched both the inside and outside of her vagina under her clothing, she was informed after the interview's conclusion by Sergeant Alquist, the interviewer and the DCF representative of what her daughter had disclosed.  The next day, Rosen called Sergeant Alquist to inform him that she had spoken explicitly and at length with her daughter about the interview and felt that there was something wrong with the girl's disclosure that

she had been penetrated.  Although she charges Alquist with omitting from the AWA that her daughter initiated this conversation, Rosen admits that, at the time of the call to Alquist, she "think[s] [she] told him [she] wasn't sure [who initiated the conversation]."  [Dkt. 24-10, Rosen Depo. at 81].  Alquist was aware at the time that, as part of the forensic interview process and "part of the waiver agreement [a parent or guardian] sign[s] with the advocacy center," St. Francis strongly encourages parents or guardians of alleged victims not to attempt to re-interview a victim or ask a victim about specific details of the incident after the conclusion of the forensic interview.  [Dkt. 24-5, Alquist Depo. at p. 71].  While Rosen argues that Alquist cannot prove with certainty that she knew of the Center's policies, Rosen admitted during deposition that, although she did not specifically remember doing so, she believed she had consented to the Center interviewing her daughter.  [Dkt. 24-9, Rosen Depo. at p. 65].  Rosen's attempt to alter her daughter's disclosure after the interview suggested to Sergeant Alquist that she was protecting Mr. Brown in some manner or did not seriously consider her daughter's allegations.

Furthermore, although the Court finds that it was reasonable for Sergeant Alquist to believe that Rosen had been informed of this policy, even if Rosen had not been so informed, this information would not change the objectively reasonable probable cause determination based upon facts known to Sergeant Alquist at the time he filed the AWA.  Rosen's additional argument that altering her daughter's disclosure only "place[d] her children at risk at some *future* time" and therefore may not constitute probable cause for her arrest likewise does not

defeat the probable cause determination underlying § 53-21(1), which expressly contemplates future harm to minors in situations where the life, limb, health or morals of a child are "likely to be injured," or "likely to be impaired."  In sum, considering the information known to Sergeant Alquist at the time he received the call from Marla Rosen, it was objectively reasonable for Alquist to conclude that Rosen's telephone call evidenced her downplaying of the incident and was evidence of a larger pattern of behavior that put Rosen's daughter and her other children at risk.

Incredibly, Rosen argues that because Mr. Brown returned to the home only to babysit his *own* biological children and not the alleged victim or her fourteen-year-old brother (a fact of which Alquist was aware), because no court order existed preventing Mr. Brown from seeing his own children, and because Brown had no history of sexual abuse, Alquist could not reasonably conclude that Rosen acted negligently in allowing Brown back into her home.  Thus, Rosen concludes that it was error for Alquist to omit from the AWA his knowledge that Brown had returned only to babysit his own biological children and that Brown had no record of sexual assault or risk of injury to a minor.  The inclusion of this information, however, does not change the probable cause analysis in the slightest and ignores Alquist's reasonable concern – based on the information known to him at the time and the serious allegations of sexual abuse pending against Mr. Brown – that the alleged victim was not the only child in danger of being sexually abused in the Rosen home.

In making this argument, Rosen assumes that a reasonable person *must* conclude that a potential sexual abuser would not abuse his own biological children.  The Court finds this argument to be patently absurd.  There is no evidence in the record that would have led Sergeant Alquist to believe that Mr. Brown was less of a potential threat to his own biological children than he was to the alleged victim.  Moreover, even if it were true that child abusers are more likely to harm children unrelated to them (a conclusion the Court does not credit), Rosen herself admitted during deposition that Brown "had raised [the alleged victim].  He had changed her diapers.  There was never any indication of anything like this.  Ever."  [Dkt. 25-8, Exh. P-5, Rosen Depo. at p. 53].  This admission would tend to negate Rosen's argument that Brown's biological children were somehow safer in his presence than the alleged victim, who Brown had seemingly raised from infancy.

Furthermore, Rosen argues that Alquist's charge in the AWA that Rosen had allowed Brown "repeated access to the victim" is without foundation, void of particularity, and deliberately or recklessly false.  However, Alquist and Rosen both were aware that, had the alleged victim not chosen to go to Lleidy Deleon's home on January 16, 2008 after failing to find someone to accompany her to the library as her mother had suggested, the alleged victim would have had no choice but to return to her home where Mr. Brown was babysitting his biological children, thus potentially putting her in direct contact with Mr. Brown on at least

one occasion.[1]  Additionally, the alleged victim and her brother both told

Sergeant Alquist that Mr. Brown had been back to the home "a few times" since

the incident.  Given that only two weeks had elapsed from the date of the alleged

incident to Alquist's interview with these two children, it would have been

reasonable for Sergeant Alquist to conclude that Mr. Brown would return to the

home on additional occasions between the date of those interviews and the date

on which Alquist submitted the AWA.  Consequently, this Court finds that it was

objectively reasonable for Alquist to conclude that, based on the alleged victim's

explicit allegations of sexual abuse against her mother's partner, Rosen had

allowed *all* of the children in her home to be placed at risk of potential harm by

sexual assault, regardless of their biological parentage, when she allowed Mr.

Brown back into her home.

     Lastly, the Court notes that the eventual disposition of Rosen's and

Brown's criminal charges is irrelevant to the analysis of probable cause, as

Sergeant Alquist's basis for arresting Rosen was objectively justifiable based

upon the facts known to him at the time of the arrest.  *See Devenpeck*, 543 U.S. at

152 (holding that the existence of probable cause "depends upon the reasonable

conclusion to be drawn from the facts known to the arresting officer at the time of

the arrest.").  "The fact that charges were later nolled or even that the accused

was later acquitted of the crime does not obviate the validity of the warrant, as

'[t]he quantum of evidence required to establish probable cause to arrest need

---

[1]    Sergeant Alquist did not include this information in the AWA.  Rather, he included it in Case/Incident Report filed on January 17, 2008 after his visit to King Phillip Middle School and his interview with the alleged victim.  [Dkt. 24-7, Exh. B, Case/Incident Report at pp. 2-3].

not reach the level of evidence necessary to support a conviction.'"  *Willoughby v. Peterson*, 3:10 CV 509 JGM, 2012 WL 3726532 (D. Conn. Aug. 27, 2012) (*citing United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983)).  Thus, where Sergeant Alquist's subjective judgments and subsequent actions were reasonably objective in light of the facts known to him at the time, and where these judgments were then substantiated by a neutral magistrate issuing the arrest warrant at issue, the disposition of the criminal charges against Rosen is irrelevant.

In conclusion, in light of the neutral magistrate's determination that probable cause existed for an arrest warrant to issue, to which this Court must give considerable deference, and in light of the information known to Sergeant Alquist at the time, the Court concludes that there was sufficient probable cause to support Rosen's arrest.  Even if the AWA were revised to reflect the alleged omissions and misrepresentations above with which Rosen has taken issue, a reasonable person would objectively conclude that probable cause existed to arrest Rosen for putting her daughter and her other children at risk of injury and/or moral impairment.  Furthermore, Rosen's failure to disclose the alleged incident to the authorities, her minimization of the abuse, and her alleged attempt to alter her daughter's disclosure reflect Alquist's reasonable concerns that Rosen either did not take her daughter's allegations seriously, was attempting to protect Mr. Brown in some manner, or both.  Thus, the Defendant's motion for summary judgment as to Rosen's claims for false arrest and malicious prosecution is GRANTED.

**b.  Qualified Immunity**

"With respect to qualified immunity, the Supreme Court has recently reminded us that 'the appropriate question is the objective inquiry of whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and information the officer [ ] possessed.'"  *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (quoting *Wilson v. Layne*, 526 U.S. 603 (1999)).  "Lawful arrest, i.e., arrest pursuant to probable cause, requires the arresting officer to have 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  *Id.* (internal quotation marks and citation omitted).  "[I]n the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause."  *Id.*  "Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law."  *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997) (internal quotation marks and citation omitted).  Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  *Escalera*, 361 F.3d at 743 (internal quotation marks and citation omitted).

"Although the tests for probable cause and arguable probable cause are thus not congruent, the concept of probable cause is the same in both inquiries. Probable cause existed if *at the moment the arrest was made . . . the facts and circumstances within the [officers'] knowledge* and of which they *had reasonably trustworthy information* were sufficient to warrant a prudent man in believing that [the suspect] had violated the law, and an officer sued under the Fourth Amendment for false arrest is entitled to immunity if a reasonable officer could have believed *that probable cause existed.*"  *Zellner*, 494 F.3d at 370. "Accordingly, like the probable cause analysis, the analysis of a qualified immunity defense to claims that official actions were taken without probable cause entails an inquiry into the facts known to the officer at the time of the arrest[.]  [A] court must evaluate the objective reasonableness of the [Officer's] conduct in light of . . . the information the . . . officers possessed."  *Id.* (internal quotation marks and citations omitted).

Because this Court finds that Rosen's arrest was supported by probable cause, Sergeant Alquist is likewise entitled to qualified immunity.  Arguable probable cause plainly exists based on the undisputed facts.  Here, where the Plaintiff did not disclose the alleged sexual abuse perpetrated against her daughter, minimized such allegations when speaking to police, allowed Marvin Brown access to the alleged victim or to her other minor children, and attempted to alter her daughter's disclosure after a forensic interview, and where Sergeant Alquist relied on the statements of the alleged victim and of other witnesses whose veracity were not called into question, it was objectively reasonable for

Sergeant Alquist to believe that probable cause existed for the Plaintiff's arrest.  It was likewise objectively reasonable for Sergeant Alquist to credit the alleged victim's testimony, as well as that of her fourteen-year-old brother and her friend's mother, Lleidy Deleon, especially in light of testimony by the Plaintiff and Mr. Brown either corroborating or not contradicting the alleged victim's account of the incident.  Furthermore, considering the lack of material omissions or false statements in the warrant application, coupled with Rosen's concession that the information in the AWA is mostly accurate, it is objectively reasonable to believe that probable cause existed where a neutral magistrate issued the warrant for Rosen's arrest.  At the very least, reasonable officers could differ as to whether Sergeant Alquist had probable cause to arrest Rosen.  Therefore, even if summary judgment is improper based upon a probable cause defense to false arrest and malicious prosecution, summary judgment is GRANTED in favor of Defendant Alquist on qualified immunity grounds.

### c.  Rosen's State Law Claims

Having granted summary judgment as to the federal law claims against the Defendant, the Court declines to exercise its supplemental jurisdiction over the Plaintiff's state law claims.  "Supplemental or pendent jurisdiction is a matter of discretion, not of right.  Thus, the court need not exercise supplemental jurisdiction in every case." *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 165-66 (D. Conn. 2005) (*citing United Mine Workers v. Gibbs*, 383 U.S. 715, 715-26 (1966)). "The federal court should exercise supplemental jurisdiction and hear a state claim when doing so would promote judicial economy, convenience and fairness

to the litigants.  The court should decline to exercise supplemental jurisdiction, however, when state law issues would predominate the litigation or the federal court would be required to interpret state law in the absence of state precedent. In addition, the court may decline to exercise supplemental jurisdiction where the court has dismissed all claims over which it has original jurisdiction."  *Id.* (*citing* 28 U.S.C. § 1367(c)(3))); *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims").

Because this Court has granted summary judgment for Sergeant Alquist on his 42 U.S.C. § 1983 claims for malicious prosecution and false arrest, over which it has original jurisdiction, this Court declines to exercise supplemental jurisdiction over Rosen's state law emotional distress claims.  *See Zito v. Fried, Frank, Harris, Shriver & Jacobson LLP*, 09 CIV. 9662, 2012 WL 2333303 (S.D.N.Y. June 19, 2012) (*citing Purgess v. Sharrock*, 33 F.3d 134, 138 (2d. Cir.1994) ("Under 28 U.S.C. 1367(a)(c), a Court has the discretion to exercise supplemental jurisdiction over pendent state law claims. If, however, 'the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.'")).  Plaintiff's state law claims are thus dismissed without prejudice to refiling in state court.

## V.   <u>Conclusion</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.  The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.  The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: December 7, 2012

35